1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RICHARD J. CRANE,                         No.  2:11-cv-0663 KJM CKD P

12                 Plaintiff,

13         v.                                    FINDINGS AND RECOMMENDATIONS

14    MIKE McDONALD, et al.,

15                 Defendants.

16

17    I. Introduction

18          Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief

19    under 42 U.S.C. § 1983.  This action was commenced on March 10, 2011 and proceeds on the

20    First Amended Complaint, in which plaintiff claims he was deprived of outdoor exercise in

21    violation of the Eighth Amendment's protection against cruel and unusual punishment.  (ECF No.

22    21 ("FAC").)  Pending before the court is defendants' motion for summary judgment (ECF No.

23    77), which has been briefed by the parties (ECF Nos. 91, 92).  For the reasons discussed below,

24    the undersigned will recommend that defendants' motion be granted.

25    II.  Summary Judgment Standards Under Rule 56

26          Summary judgment is appropriate when it is demonstrated that there "is no genuine

27    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

28    Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

1

1   "citing to particular parts of materials in the record, including depositions, documents,

2   electronically stored information, affidavits or declarations, stipulations (including those made for

3   purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

4   Civ. P. 56(c)(1)(A).

5        Summary judgment should be entered, after adequate time for discovery and upon motion,

6   against a party who fails to make a showing sufficient to establish the existence of an element

7   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

8   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

9   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

10  Id.

11       If the moving party meets its initial responsibility, the burden then shifts to the opposing

12  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

13  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

14  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

15  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

16  and/or admissible discovery material, in support of its contention that the dispute exists or show

17  that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

18  R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

19  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

20  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

21  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

22  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

23  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

24       In the endeavor to establish the existence of a factual dispute, the opposing party need not

25  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

26  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

27  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

28  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

1   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

2   amendments).

3          In resolving the summary judgment motion, the evidence of the opposing party is to be

4   believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

5   facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

6   U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

7   obligation to produce a factual predicate from which the inference may be drawn.  See Richards

8   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

9   (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

10  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

11  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

12  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

13  III.  Analysis

14         In determining whether summary judgment is appropriate, the court considers the

15  following record facts[1]:

16         Between April 2004 and September 2008, plaintiff was housed at Salinas Valley State

17  Prison ("SVSP").  Defendant Evans was the Warden at SVSP, and defendant Mantel was a

18  Facility Captain at SVSP.  (Defendants' Undisputed Facts ("DUF") 1, 2.)

19         In September 2008, plaintiff was transferred to High Desert State Prison ("HDSP").

20  Defendant Davey was a Facility Captain at HDSP.  (DUF 1, 2.)

21         In a verified complaint, plaintiff alleges that, between April 2004 and the filing of the

22  FAC, he was "denied outdoor exercise for some month(s) at a time."[2]  (FAC ¶ 13.)  He alleges

23  that "[t]he denial of outdoor exercise has caused plaintiff's body to severely deteriorate, and he

24

25  [1] See ECF Nos. 80, 88, 89.

26  [2] This is not to say that plaintiff states an Eighth Amendment claim as to deprivations up and until
    the filing of the FAC.  Plaintiff's specific allegations and attachments concern events through
27  2010, though he alleges in conclusory terms that "a pattern of lockdown with brief days off"
    continued until "the present date." (FAC ¶ 13.)

28

1   cannot walk more than a short distance due to the pain in his legs.  His legs are in constant pain,

2   and he is certain he has life threatening conditions."  (FAC ¶ 27.)  Plaintiff alleges that defendants

3   have engaged in a years-long scheme to deprive prisoners of outdoor exercise so as to

4   "manipulate the CDCR budget" by creating conditions that result in an "increase in pay" for

5   prison staff.  (FAC ¶¶ 29-34.)

6   A. <u>Exhaustion</u>

7       Before turning to the merits of summary judgment, the court addresses defendants'

8   argument that plaintiff's claims concerning lockdowns at SVSP prior to January 18, 2008 should

9   be dismissed for failure to exhaust administrative remedies.[3]  In support, defendants have

10  submitted court records showing that an earlier § 1983 case filed by plaintiff, in which plaintiff

11  claimed he was denied outdoor exercise at SVSP, was dismissed for failure to exhaust

12  administrative remedies prior to suit.

13  1. <u>Facts</u>

14      On February 6, 2007, plaintiff initiated a pro se prisoner action pursuant to 28 U.S.C.

15  §1983 in the U.S. District Court for the Northern District of California.  <u>Crane v. Evans, et al.</u>,

16  No. 5:07-cv-0763 JF (N.D. Cal.) ("<u>Evans</u>").[4]  As in the instant case, plaintiff alleged that

17  defendants Evans and Mantel, among others, violated his Eighth Amendment rights by depriving

18  him of sufficient outdoor exercise at SVSP.  In the operative First Amended Complaint, plaintiff

19  alleged that from April 2004 through the date of the filing of the complaint, he had been "denied

20  outdoor exercise for months at a time" and that "the past almost four years of a lockdown pattern"

21  had caused him to suffer back pain, joint and nerve damage, stomach pain, and leg cramps.

22  (Defs' Ex. A-B, ECF No. 80-1.)  Plaintiff alleged that he was denied outdoor exercise for certain

23  specific amounts of time in 2004, 2005, 2006, 2007, and 2008.  (Defs' Ex. B, ECF No. 80-1 at

24  21-23.)

25  /////

26  _____

    [3] Defendants do not dispute that plaintiff's claims concerning later lockdowns are exhausted.

27

28  [4] A court may take judicial notice of court records.  <u>See</u> <u>MGIC Indem. Co. v. Weisman</u>, 803 F.2d
    500, 505 (9th Cir. 1986); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980).

1    Evans, Mantel, and other named defendants moved to dismiss the complaint on the

2    grounds that plaintiff had failed to exhaust his administrative remedies prior to filing suit.  (Defs'

3    Ex. C, ECF No. 80-2.)  See 42 U.S.C. § 1997e(a).  On September 22, 2009, the Evans court

4    granted defendants' motion to dismiss the First Amendment Complaint, finding that plaintiff had

5    not exhausted administrative remedies prior to filing suit on February 6, 2007.  (Defs' Ex. D, ECF

6    No. 80-2 at 25.)  The court noted that, while plaintiff filed administrative appeals in August 2007,

7    "these appeals were not exhausted until December 2007, which is well after Plaintiff filed this

8    action in February 2007."  (Id.)  In fact, the Evans court appears to be referring to a group

9    administrative appeal that was exhausted at the final level of review on January 18, 2008.  (See

10   Defs. Ex. C, ECF No. 80-2 at 6; Defs.' Ex. B, ECF No. 80-1 at 49-65.)

11   In the instant case, defendants acknowledge that this same administrative appeal

12   concerning lack of outdoor exercise at SVSP[5] was exhausted on January 18, 2008, when it was

13   denied at the Director's Level of review.  The group appeal was submitted in August 2007 and

14   signed by over 200 inmates in SVSP's Facility A, including plaintiff.  (Complaint, Ex. B, ECF

15   No. 1 at 35-53.)

16   In this group appeal, inmates claimed that

17       for the past 4 1/2 months the administration and it's [sic]
18       correctional employees have been manipulating the state civil
         service rules by manipulating their hours of employment.  Since the
19       beginning of February until now the administration has been
         claiming lack of staff, locking "A" Facility Down[]....  Ad-Seg
20       inmates receive more recreation than "A" Facility General
         population, canteen, showers after "3" days, etc, etc.

21   (Complaint, Ex. B, ECF No. 1 at 41-42.)  The inmates claimed that this scheme resulted in

22   correctional staff's keeping "the inmate population locked in their cells for weeks, and months on

23   end."  (Id. at 41.)

24   In the Director's Level response issued January 18, 2008, the reviewer found that the

25   inmates failed to demonstrate that their rights "had been violated by the ongoing lack of staff or

26   the use of vacation time by staff" and that "numerous lockdowns have resulted from violence

27

28   [5] Log No. SVSP-07-03411.

1    initiated by inmates."  (Id. at 37-38.)

2         In the instant motion for summary judgment, defendants argue that, because this group

3    appeal was not exhausted until January 18, 2008, any claims concerning lockdowns prior to that

4    date should be dismissed for non-exhaustion.

5    2. Legal Standard

6         Section 1997(e)(a) of Title 42 of the United States Code provides that "[n]o action shall be

7    brought with respect to prison conditions under section 1983 of this title, . . . until such

8    administrative remedies as are available are exhausted."  42 U.S.C. § 1997(e)(a) (also known as

9    the Prison Litigation Reform Act ("PLRA")).  The PLRA requires that administrative remedies be

10   exhausted prior to filing suit.  McKinney v. Carey, 311 F.3d 1198 (9th Cir. 2002).

11        Exhaustion requires that the prisoner complete the administrative review process in

12   accordance with all applicable procedural rules.  Woodford v. Ngo, 548 U.S. 81 (2006).

13   California state regulations provide administrative procedures in the form of one informal and

14   three formal levels of review within the California Department of Corrections and Rehabilitation

15   (the "CDCR") to address plaintiff's claims.  See Cal. Code  Regs. tit. 15, §§ 3084.1-3084.7.

16   Administrative procedures generally are exhausted once a plaintiff has received a "Director's

17   Level Decision," or third level review, with respect to his issues or claims.  Cal. Code Regs. tit.

18   15, § 3084.5.

19        "The level of detail in an administrative grievance necessary to properly exhaust a claim is

20   determined by the prison's applicable grievance procedures."  Jones v. Bock, 549 U.S. 199, 218

21   (2007).  In California, prisoners are required to lodge their administrative complaint on a CDC

22   Form 602, which requires only that the prisoner "describe the problem and action requested."

23   Cal. Code Regs. tit. 15, § 3084.2(a).  Thus in California, "[a] grievance need not include legal

24   terminology or legal theories unless they are in some way needed to provide notice of the harm

25   being grieved.  A grievance also need not contain every fact necessary to prove each element of

26   an eventual legal claim.  The primary purpose of a grievance is to alert the prison to a problem

27   and facilitate its resolution, not to lay groundwork for litigation."  Griffin v. Arpaio, 557 F.3d

28   1117, 1120; accord, Morton v. Hall, 599 F.3d 942, 946 (9th Cir. 2010).

1    When the district court concludes that the prisoner has not exhausted administrative

2    remedies on a claim, "the proper remedy is dismissal of the claim without prejudice." Id. at 1120;

3    see also Lira v. Herrera, 427 F.3d 1164, 1170 (9th Cir. 2005) ("mixed" complaints may proceed

4    on exhausted claims).  Thus, "if a complaint contains both good and bad claims, the court

5    proceeds with the good and leaves the bad." Jones, 549 U.S. at 221.

6    3. Discussion

7    To recap, plaintiff's allegations in the FAC concern the period between 2004 and 2010.  It

8    is undisputed that plaintiff has exhausted administrative remedies as to lockdowns after January

9    18, 2008.

10    Prior to the commencement of the instant action, a group appeal complaining of

11    lockdowns at SVSP "since the beginning of February [2007]" was exhausted at the Director's

12    Level.  Thus plaintiff has exhausted administrative remedies as to any lockdowns between

13    February 1, 2007 and January 18, 2008.

14    As to lockdowns in 2004, 2005, 2006, and January 2007, plaintiff's "outdoor exercise"

15    claims concerning these periods were dismissed in Evans for failure to exhaust administrative

16    remedies.   There is no evidence that plaintiff subsequently exhausted his remedies as to these

17    lockdowns and/or years prior to initiating this action in March 2011.  To allow plaintiff to

18    proceed on allegations of unconstitutional lockdowns over a three-year period, which prison

19    officials never had the opportunity to address because the 2004-2006 lockdowns were never

20    challenged in administrative appeals, would run afoul of the exhaustion doctrine and purpose.

21    Thus the court concludes that plaintiff's claims concerning lockdowns between April 2004 and

22    January 2007 should be dismissed for failure to timely exhaust administrative remedies. [6]

23    B. Summary Judgment

24    For purposes of summary judgment, the court proceeds to consider plaintiff's claims

25    based on lockdowns after February 2007.

26    /////

27

28

---

[6] In light of the foregoing, the undersigned not reach defendants' alternative argument that claims based on lockdowns between 2004 and March 2007 are barred by the statute of limitations.

1. Facts

a. SVSP Facts

While at SVSP, plaintiff generally was housed in Facility A when he was not in Administrative Segregation.  (Defs' Ex. E, ECF No. 80-2 at 39-41.)  Defendants have submitted Program Status Reports for SVSP's Facility A for the period of January 2007 through September 2008.[7]  (Decl. of G. Lopez, ECF No. 80-3 at 2-3.)  Most are signed by Warden Evans and/or Facility Captain Mantel.  The reports indicate as follows:

On May 1, 2007, there was an inmate-on-inmate assault on the Facility A patio.  The assailant used a weapon, and the victim sustained numerous injuries.  As a result, all inmates on A-Facility were placed on modified programming[8], and all recreational activities were suspended. On May 30, 2007, the day after the investigation into this incident was closed, A-Facility returned to normal programming.  (DUF 27-28.)

On August 19, 2007, staff received information that a correctional officer was targeted for assault.  Facility A was placed on modified programming pending an investigation into the matter.  After the investigation was completed, A-facility was returned to normal programming by August 30, 2007.  (DUF 29-30.)

_____

[7] For the reasons discussed below, the court considers on summary judgment plaintiff's claims concerning lockdowns occurring after February 2007.

[8] A modified program typically involves the suspension of various programs or services for a specific group of inmates, or in a specific portion of a facility.  Generally, during a modified program, work, education, and outdoor exercise might be suspended; telephone, canteen, or visiting privileges might be restricted, and meals might be delivered to the inmates' cells rather than being served in the dining hall.  These programs and privileges are restored incrementally as the facility administration deems appropriate based on safety and security concerns.  (DUF 4.)

Defendants distinguish modified programs from "lockdowns," which typically involve "the restriction of all inmates to their cells or dormitory beds and the suspension of all programs and all but essential functions. . . . During a lockdown, inmates are not released from their cells except on a case-by-case basis."  (DUF 5.)  "True lockdowns are rare occasions and are generally imposed after serious threats to institutional security and the safety of both inmates and staff."  (DUF 6.)

Plaintiff asserts that there was effectively no difference between "modified programs' and "lockdowns."  (ECF No. 88 at 5-6.)  For purposes of summary judgment, drawing all reasonable inferences in favor of the non-moving party, the court assumes that both the "modified programs" and "lockdowns" described herein resulted in the suspension of outdoor exercise for affected inmates.

On October 23, 2007, a weapon was discovered in the locker of an inmate who worked in the A-Facility main kitchen.  A search of the area was conducted, and staff found several pieces of metal stock.  The facility was placed on modified programming until searches and an investigation could be completed.  The facility returned to normal programming by November 8, 2007.  (DUF 31-32.)

On November 18, 2007, staff discovered the body of an inmate who had been murdered in A-Facility.  Certain housing units of A-Facility and the gym were placed on modified programming pending the completion of an investigation.  After the investigation of the homicide was completed, A-Facility resumed normal programming by November 20, 2007.  (DUF 32-33.)

On January 4, 2008, certain units of Facility A were placed on modified programming after an attempted murder occurred.  By January 8, 2008, the investigation into the matter was concluded, and A-Facility returned to normal programming.  (DUF 34.)

In late January 2008, another attempted murder of an inmate took place in the A-Facility recreation yard.  The facility was placed on modified programming pending the completion of an investigation into the matter.  After the investigation was completed, the facility returned to normal programming on February 14, 2008.  (DUF 35.)

On March 2, 2008, staff received a note stating that two inmates had drugs and had made threats against a staff member.  Building 3 of A-Facility was on modified programming for two days while this matter was investigated, after which it was returned to normal programming.  (DUF 36.)

On March 21, 2008, an inmate battered two officers in building A-5.  The building was placed on modified programming until April 2, 2008, when it was returned to normal programming.  (DUF 37.)

On August 21, 2008, A-Facility was placed on modified programming after staff received a note indicating that an A-Facility staff member was targeted for assault.  By September 11, 2008, A-Facility was returned to normal programming.  (DUF 38-39.)

Plaintiff was transferred from SVSP on September 15, 2008.  (DUF 40.)

/////

9

b. <u>HDSP Facts</u>

On September 17, 2008, plaintiff was transferred to HDSP, where he was housed on the Special Needs Yard on Facility B.  (FAC ¶ 18; DUF 41.)  Facility Captains such as defendant Davey generally make the decisions to institute lockdowns, contingent on the Warden's approval. (DUF 13.)  The following record facts are based on Defendants' Exhibit F, filed under seal.  (<u>See</u> ECF No. 84.)

<u>October 22 – December 2, 2008</u>

On October 19, 2008, a confidential source indicated that a correctional officer was targeted for assault by inmates on Facility B.  Two inmates were placed into administrative segregation pending further investigation and a threat assessment.  (DUF 42.)  Two days later, an inmate was found in possession of an inmate-manufactured stabbing weapon.  Correctional staff had information that the inmate was going to stab another inmate.  (DUF 43.)  On October 22, 2008, a confidential source, deemed reliable, told officials that a correctional sergeant and a correctional officer were targeted for assault by inmates on Facility B.  (DUF 44.)

Based on this information, Facility B was placed on modified programming pending further investigation and the completion of searches, inmate interviews, and a threat assessment. (DUF 45.)  Following the institution of the modified program, staff learned that inmates had also threatened another officer.  (DUF 47.)  On November 21, 2008, culinary staff at B-Facility discovered that a large piece of metal stock from an oven was missing.  Due to the failure to recover the missing metal, the lockdown was continued to conduct another facility-wide search. (DUF 48.)

On December 2, 2008, B-Facility was returned to normal programming.  (DUF 49.)

<u>February 17 – March 10, 2009</u>

On February 17, 2009, B-Facility was placed on modified programming after medical staff discovered metal missing from a clinic holding cell.  The missing metal was aluminum of very sturdy construction, and measured 17 1/2 inches by one half inch.  (DUF 50.)  After the investigation and searches were completed, the facility was returned to regular programming on March 10, 2009.  (DUF 52.)

1 <u>March 27 – May 12, 2009</u>

2  On March 27, 2009, all of HDSP was placed on modified programming after a sergeant

3 was assaulted at a rest stop.  (DUF 53.)  Because there was no direct evidence linking the assault

4 to the institution, all facilities were returned to normal programming by April 2, 2009.  (DUF 54.)

5  However, before B-Facility was returned to normal programming, two Hispanic inmates

6 attempted to murder a White inmate while returning from the evening meal and pill line.  The

7 White inmate was repeatedly stabbed, sustaining eleven stab wounds to the arm, chest, and

8 stomach areas.  The weapon was recovered, and appeared to be constructed of flat metal stock

9 sharpened to a point; it measured 6 3/4 inch by 1 inch.  (DUF 55.)

10  The modified program for B-Facility remained in effect until searches could be conducted

11 and the interview of all inmates housed on that facility could be completed.  (DUF 56.)  During

12 the investigation, staff determined that the assault was due to an incident between two of the

13 inmates that had occurred at another prison in 2005.  The searches turned up no additional

14 weapons, and there was no indication of any additional threats toward staff or inmates.  All

15 inmates were returned to normal programming as of May 12, 2009.  (DUF 57.)

16 <u>June 30 – July 16, 2009</u>

17  On June 30, 2009, B-Facility, Building 4 was placed on modified programming after staff

18 received an anonymous note indicating that a specific officer was to be assaulted.  After an

19 investigation and searches of the unit were conducted, the building was returned to normal

20 programming on July 16, 2009.  (DUF 58.)

21 <u>July 30 – September 9, 2009</u>

22  On July 30, 2009, five inmates armed with weapons assaulted another inmate.  The victim

23 had multiple lacerations to his head and face, seven puncture wounds on his back and shoulder,

24 and a deep laceration to his right side.  Staff determined that the incident required further

25 investigation and placed B-Facility on modified programming until they could determine the

26 cause of the incident and ensure that further related violence did not occur.  (DUF 59.)  During

27 the investigation, all the inmates were interviewed and the yards, mattresses, and inmates were

28 searched with metal detectors.  The searches led to the discovery of one inmate with a weapon, as

1   well as other contraband.  The institution returned to normal programming by September 9, 2009.

2   (DUF 59-61.)

3   <u>September 17 – December 14, 2009</u>

4        On September 17, 2009, two separate stabbing incidents occurred on the B-Facility main

5   exercise yard at the same time.  Three Hispanic inmates who were associated with the disruptive

6   group known as the "Two-Five," stabbed three Mexican National inmates.  All three assailants

7   used weapons, and all victims suffered serious injuries and required hospitalization.  All inmates

8   on B-Facility were placed on modified programming.  (DUF 62.)

9        During this modified program, all inmate central files were reviewed to determine gang or

10   disruptive group affiliation, or history of violence.  Prison officials conducted searches of all

11   inmates and the entire facility, using metal detectors to search the yard and all mattresses.  All

12   members who were identified as affiliated with the disruptive group "Two-Five" were segregated

13   into Building 2.  After the investigation was completed, prison officials were to complete a threat

14   assessment before returning to regular programming.  (DUF 63-64.)

15        On October 24, 2009, staff received information that members of the "Two-Five" group

16   were planning to assault any inmate convicted of a sex crime on October 26, 2009.  Staff also

17   learned that the White inmates were planning a large-scale assault on the members of the "Two-

18   Fives."  Prison staff determined that further investigation was needed into the causes of the

19   inmate unrest and the possibility of continued assaults on inmates.  (DUF 65.)

20        On November 12, 2009, prison officials received additional information that the "Two-

21   Fives" were planning an assault on staff.  (DUF 66.)

22        By November 17, 2009, staff began a controlled release of the inmates housed in the B-

23   Facility gym.  The process was successful, and was continued throughout the entire facility, one

24   building at a time in a rotational manner.  (DUF 67.)  By December 14, 2009, inmates not

25   associated with the "Two-Five" were allowed outdoor exercise.  (DUF 69.)

26   <u>January 4 – February 23, 2010</u>

27        On January 4, 2010, prison staff received notes indicating that inmates associated with the

28   "Two-Fives" were attempting to promote or carry out assaults on unidentified staff members.

1   Staff also received information that members of the "Two-Fives" were attempting to recruit

2   inmates in the general population to assault staff members and other inmates.  Based on the

3   plethora of information received regarding the planning of violent attacks, prison officials placed

4   the entire inmate population of B-Facility back on modified programming pending another

5   investigation.  (DUF 70.)  In an effort to return to normal programming as quickly as possible, B-

6   Facility staff worked with the Institutional Gang Investigations (IGI) Unit and the Institutions

7   Security Unit (ISU) to identify the inmates creating unrest.  (DUF 71.)

8        By February 16, 2010, staff received additional information that there would be a

9   resumption of violence when the unlock process was completed.  (DUF 72.)

10       The following week, the incremental unlock process began, allowing inmates from the

11   same building to participate in exercise yard.  Based on the success of this phase, staff planned to

12   progress to phase three of the unlock process the following week, allowing inmates from two

13   separate buildings to participate in yard at the same time.  (DUF 73.)  Each phase of the unlock

14   process lasted approximately two weeks in order to give staff an opportunity to observe inmate

15   interaction before proceeding to the next phase.  (DUF 75.)  By June 8, 2010, B-Facility was

16   returned to normal programming.[9]  (DUF 76.)

17   2. Legal Standard

18       The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

19   Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

20   unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

21   312, 319 (1986).  To prevail on an Eighth Amendment claim, the plaintiff must show, objectively,

22   that he suffered a "sufficiently serious" deprivation.  Farmer v. Brennan, 511 U.S. 825, 834

23   (1994); Wilson v. Seiter, 51 U.S. 294, 298–99 (1991).  The plaintiff must also show that each

24   defendant had, subjectively, a culpable state of mind in causing or allowing plaintiff's deprivation

25   to occur.  Farmer, 511 U.S. at 834.

26   /////

27   _____

[9] Neither party has submitted evidence concerning lockdowns at HDSP after June 2010.

28

1    Outdoor exercise is a basic human need protected by the Eighth Amendment, and the

2    denial of outdoor exercise may violate the Constitution, depending on the circumstances.

3    Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010); Norwood v. Vance, 591 F.3d 1062, 1070

4    (9th Cir. 2010).  While the "temporary denial of outdoor exercise with no medical effects is not a

5    substantial deprivation," Norwood, 591 F.3d at 1070 (internal quotation and citation omitted),

6    when an inmate alleges the denial of constitutionally adequate outdoor exercise, the inquiry is fact

7    specific.  In determining whether a deprivation of outdoor exercise is sufficiently serious, the

8    court must consider the circumstances, nature, and duration of the deprivation.  Spain v.

9    Procunier, 600 F.2d 189, 199 (9th Cir. 1979).

10   The Ninth Circuit has clarified the elements necessary to state a deprivation that would

11   rise to the level of an Eighth Amendment violation:

12
13   > An Eighth Amendment claim that a prison official has deprived
     > inmates of humane conditions must meet two requirements, one
     > objective and one subjective. Allen v. Sakai, 48 F.3d 1082, 1087
14   > (9th Cir. 1995). "Under the objective requirement, the prison
     > official's acts or omissions must deprive an inmate of the minimal
     > civilized measure of life's necessities. The subjective requirement,
15   > relating to the defendant's state of mind, requires deliberate
     > indifference." Id. (citations omitted).
16

17    Lopez v. Smith, 203 F.3d 1122, 1132–33 (9th Cir. 2000).  Nevertheless, "the Ninth Circuit has

18   not identified a specific minimum amount of weekly exercise that must be afforded" under the

19   Eighth Amendment." Jayne v. Bosenko, 2009 WL 4281995, at *8 (E.D. Cal. Nov. 23, 2009)

20   (citation omitted).  Indeed, complete denial of outdoor exercise for a month is not

21   unconstitutional.  Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980) (denial of yard time

22   for a month not unconstitutional); May v. Baldwin, 109 F.3d 557, 565–66 (9th Cir. 1997) (denial

23   of yard time for 21 days not unconstitutional).  However, in Lopez v. Smith, 203 F.3d 1122,

24   1132-33 (9th Cir. 2000), the Ninth Circuit found that plaintiff's claim that he was denied all

25   outdoor exercise for six and a half weeks met the objective requirement for an Eighth

26   Amendment claim.  Furthermore, for a temporary denial of exercise to be actionable, plaintiff

27   must demonstrate an adverse medical impact.  Id., 203 F.3d at 1133 n. 15 ("the clear implication

28   of May is that temporary denials of outdoor exercise must have adverse medical effects to meet

14

1   the Eighth Amendment test, while long-term deprivations are substantial regardless of effects.").

2   3. <u>Discussion</u>

3   a. <u>Short-Term Deprivations</u>

4         The court first considers plaintiff's short-term denials of outdoor exercise.  While housed

5   at SVSP, plaintiff was denied outdoor exercise for periods of less than one month – sometimes,

6   only a few days – on several occasions.  Similarly, while housed at HDSP, he was twice denied

7   outdoor exercise for relatively short periods: February 17 – March 10, 2009 and June 30 – July

8   16, 2009.  Under Ninth Circuit precedent, these are considered "temporary" denials of exercise, in

9   contrast to "long-term" deprivations.  <u>See</u> <u>Lopez</u>, 203 F.3d at 1133, citing <u>May</u>, 109 F.3d at 565;

10  <u>see also</u> <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1154 (9th Cir. 2010) (denial of outdoor exercise for

11  one month was "temporary"), citing <u>Hayward</u>, 629 F.2d at 603.  To create a genuine dispute of

12  fact as to whether these denials violated the Eighth Amendment, plaintiff must demonstrate an

13  adverse medical impact.  <u>Lopez</u>, 203 F.3d at 1133.

14        In his verified complaint, plaintiff alleges that "[t]he denial of outdoor exercise has caused

15  plaintiff's body to severely deteriorate, and he cannot walk more than a short distance due to the

16  pain in his legs.  His legs are in constant pain, and he is certain he has life threatening

17  conditions."  (FAC ¶ 27.)  Plaintiff has or had weekly medical exams to monitor his treatment for

18  Hepatitis C.  (Defs.' Ex. I, ECF No. 80-4.)  At these appointments, he complained of leg pain,

19  which he attributed to being on lockdown/modified programming.  He was "advised to do leg

20  stretching and walking in his cell as much as possible to alleviate his symptoms."  (<u>Id.</u> at 9.)  At

21  an October 2012 medical examination, the nurse practitioner examining plaintiff found "no

22  obvious signs of adverse physical effects . . . from being on lockdown or modified programming"

23  and attributed plaintiff's body aches and leg pains to his treatment for Hepatitis C.  (<u>Id.</u> at 10.)[10]

24        In a September 2013 telemedicine consultation for "follow-up of successfully treated

25  hepatitis B and hepatitis C," plaintiff was found to be "asymptomatic and has no specific

26

27  [10] Elsewhere in the record, plaintiff describes his "debilitating treatment for hepatitis (C B1) on
    Rivarin and Interferon, which is known as liquid chemotherapy."  (ECF No. 31-1 at 7.)

28

1    complaints." (ECF No. 91 at 159.)  Similarly, in a June 2013 telemedicine evaluation for

2    hepatitis, the doctor's report of plaintiff's examination did not mention leg pain or any issues with

3    plaintiff's extremities.  (Id. at 165-166.)

4        On this record, plaintiff has not created a genuine dispute of fact as to whether his short-

5    term denials of outdoor exercise in 2007, 2008, and 2009 created an adverse medical impact.[11]

6    As summary judgment should be granted insofar as plaintiff's claims rest on these events, the

7    court turns to the long-term denials of exercise described above.

8    b.  Long-Term Deprivations

9        As set forth above, plaintiff was transferred to HDSP in mid-September 2008.  Between

10   October 22, 2008 and February 23, 2010, plaintiff was presumptively denied outdoor exercise for

11   five periods lasting 41 days, 46 days, 41 days, 88 days, and 50 days, respectively.[12]  Put another

12   way, during 266 of these 489 days (cumulatively, almost nine out of sixteen months), plaintiff

13   was deprived of outdoor exercise due to security concerns at HDSP.[13]

14       In Hayward, 629 F.2d at 603, the Ninth Circuit concluded that denying inmates at San

15   Quentin yard exercise for a month during a lockdown did not violate the Eighth Amendment,

16   where "the lockdown was in response to a genuine emergency" in which 84 assaults with

17   weapons, 12 killings, 71 cases of possession of weapons, and 2 attempted escapes, took place at

18

19   [11] Certainly plaintiff has established the possibility that the *cumulative* effect of repeated denials
     of exercise – some short, some long – over a period of years, contributed to his leg pain and
20   difficulty walking.  However, as long-term denials of exercise are considered "sufficiently
     serious" to meet the objective prong of the test for an Eighth Amendment violation, see Thomas,
21   611 F.3d at 1150-1151, it is not necessary to consider whether plaintiff was harmed by these
     long-term deprivations, as discussed below.
22

23   [12] October 22 – December 2, 2008 (41 days); March 27 – May 12, 2009 (46 days); July 30 –
     September 9, 2009 (41 days); September 17 – December 14, 2009 (88 days); January 4 –
24   February 23, 2010 (50 days).

25   [13] As a preliminary matter, the court finds that defendant Davey, a Facility Captain at HDSP who
26   participated in the decision-making process concerning lockdowns, can be reasonably inferred to
     have engaged in conduct that satisfies the causation requirement for liability under § 1983.  See
27   Norwood v. Cate, 2013 WL 1127604, *19 (E.D. Cal. March 18, 2013) (findings and
     recommendations adopted in full by district court on May 3, 2013) (facility captain sufficiently
28   responsible for lockdown to find § 1983 causation on summary judgment).

1  the prison within a single year.  The Ninth Circuit has since clarified that ordinary prison violence

2  does not constitute an "emergency" that renders long periods of lockdown constitutional.

3  Thomas, 611 F.3d at 1154 ("Documented threats and assaults happen frequently in prisons.

4  Given that an emergency is different from normal prison conduct, an emergency cannot be

5  deemed to exist simply because there are documented threats and assaults from time to time –

6  otherwise every prison would be in a constant state of emergency.").

7          Assuming the series of threats and assaults between 2008 and 2010 did not rise to the

8  level of a "state of emergency" at HDSP, the court applies the analytical framework set forth in

9  Thomas:  First, was the deprivation "sufficiently serious" to support an Eighth Amendment

10  claim?  Here, the answer is yes.  Whether considered as individual deprivations of 41 days or

11  more, or cumulatively over a sixteen-month period, the length of time plaintiff was denied

12  outdoor exercise renders his deprivation objectively serious under existing law.  See 611 F.3d at

13  1151 (six-week prohibition on outdoor exercise is "sufficiently serious" to support constitutional

14  claim).

15          Second, was the risk to plaintiff sufficiently "obvious" to prison officials that they must

16  have been aware of the severity of the deprivation?  Id.  Here as in Thomas, it is undisputed that

17  prison officials knew the length and scope of Facility B inmates' confinement without outdoor

18  exercise.  Id. at 1152.  In light of state regulations mandating regulating outdoor exercise for

19  inmates, and case law "uniformly stress[ing] the vital importance of exercise for prisoners," the

20  Ninth Circuit concluded that prison officials were aware as a matter of law "of the potential

21  consequences of depriving an inmate of out-of-cell exercise for an extended period of time."  Id.

22  This reasoning applies here as well.

23          Third, the court considers whether prison officials acted "reasonably" in depriving

24  plaintiff of outdoor exercise for an extended length of time.  Factors to be considered include "the

25  serious risk to [plaintiff's] mental and physical health; the level of documented assaults and

26  threats at the facility during the [period] [plaintiff] was deprived of exercise; . . . and the prison

27  authorities' failure to consider providing him with alternative opportunities to exercise."  611

28  F.3d at 1153.

As to each of the long-term deprivations at HDSP, defendants have offered similar evidence and reasoning.  Essentially, they provide evidence that prison staff learned of threats to the safety of correctional officers, staff, and/or inmates on Facility B.  Harbingers of potential future violence included gang attacks, inmate-on-inmate assaults, missing pieces of metal, inmates in possession of weapons, and information that certain inmates were planning to assault staff or other inmates.  Prison officials responded to these threats and disruptions by placing portions or all of Facility B on modified programming.  According to defendants' evidence, if an investigation indicates there is a likelihood of continued violence, or the disruption involves "large scale disturbances between prison gangs or different ethnic groups, or disturbances resulting in violence towards staff," a lockdown can continue for an extended period of time. (DUF 19.)  Thus "the return to normal programming was, in certain instances, a slow process that involved investigations and interviews with inmates, completion of searches, the involvement of other institutions, and a staff determination of whether it was safe to return to normal programming."  (ECF No. 92 at 5; see DUF 6-25.)

Based on the foregoing, the court concludes that defendants have met their initial burden to cite evidence in support of the assertion that there is no genuine dispute of material fact as to whether Davey was deliberately indifferent, as implementing the lockdowns was "reasonable." See Thomas, 611 F.3d at 1150-1151.

Thus the burden shifts to plaintiff to establish that a genuine issue of material fact exists as to Davey's deliberate indifference.  A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence.  Lopez, 203 F.3d at 1132 n.14.  In the FAC, plaintiff alleges in conclusory terms that defendants are depriving prisoners of exercise pursuant to a "scheme" for "financial gain."  As such allegations are speculative rather than based on personal knowledge, they do not establish a material dispute of fact.  Nor do numerous records attached to the FAC that predate plaintiff's transfer to HDSP in September 2008.

Plaintiff has also submitted records of his 602 inmate appeals of lockdowns at HDSP.  In Log No. HDSP-B-08-03322, plaintiff questioned the basis of the October 2008 lockdown (e.g.,

18

asserting that prison officials' information was not "reliable" and "there was no credible threat"), complained about a lack of notice to inmates, and requested to be released from prison due to the lack of outdoor exercise and programming. (FAC at 54-55.) In a February 2009 personal interview, plaintiff continued to assert that he should be released from prison or made parole-eligible due to the lockdowns. (Id. at 59-60.) Prison officials considered and denied his requests, noting that the lockdown remained in effect during the investigation of a potential staff assault and that plaintiff had received all medical and mandatory programs during the lockdown, including "medical, dental, and mental health appointments, law library access, showers and other necessary appointments." (Id. at 52, 57-58; see id. at 66-67 (October 2008 memo by defendant Davey proposing "plan of operation" for the lockdown)). A reviewer noted that HDSP did not have "sufficient staffing resources" to conduct other out-of-cell activities while investigating the threat prompting the lockdown. (Id. at 58.) In seeking Director's Level review of his grievance in March 2009, plaintiff asserted: "My legs are aching. My stomach is aching. My arms are aching. I am suffering inhumane treatment, and I need intervention." (Id. at 55.) Denying plaintiff's appeal at the Director's Level of review, the reviewer stated that the lockdown was implemented for safety and security reasons and there was no evidence that staff violated policy. (Id. at 52.)

In Log No. HDSP-09-01921, plaintiff challenged the lockdown beginning in September 2009, asserting that it violated his rights and requesting that metal detectors be used to search for weapons so he could resume exercising outdoors. (FAC at 69.) Plaintiff argued that "[t]he responsible individuals alone should be punished. This is a group punishment, persecuting the SNY population for incidents for which 99% of the population is not responsible for." (Id. at 71.) Prison officials responded to his grievances, stating that the lockdown was in response to safety issues and would be lifted after the investigation into gang-related activities was complete. His appeal was partially granted, insofar as metal detectors were already being used. (Id. at 69-75.)

In Log. No. HDSP-31-09-11658, plaintiff asserted in April 2009 that he had been denied outdoor exercise for approximately 50 days and was suffering pain in his legs, arms, and stomach and over his entire body. He asked to be released from prison "to regain his health, if possible" or

transferred to federal prison.  He also asked to receive the results of a CT scan of his stomach conducted at an outside hospital one month earlier.  At the informal level of review, plaintiff's request was partially granted as to the CT scan.  On May 10, 2009, plaintiff appealed, stating he had been in solitary confinement "for some 120 days of 150 days.  I have stomach pain . . . No exercise, constant leg pain, pain in arms and over entire body."  (FAC at 81.)

On June 18, 2009, a nondefendant prison official stated in the first-level response to plaintiff's complaint:

> During your interview you stated that your complaint regarding lack of exercise was made during lockdown.  Now you have been off lock down for three weeks and have been able to exercise.  You were given the results of your abdominal CT scan as requested.  You were told that release from prison or transfer to a federal prison is not within the scope of the appeal process.

(FAC at 83.)  The reviewer concluded that plaintiff's request had been partially granted.

On July 6, 2009, plaintiff stated that he was dissatisfied with this response and sought a second level of review.  (FAC at 82.)  Four days later, a non-defendant prison official stated in the second-level response to plaintiff's complaint:

> Be advised that lockdown is a custody program issue not a medical issue.  You have the option of exercising in your cell as do the other inmates locked down.  . . . As you were previously told, release from prison or transfer to a federal prison is not within the scope of the medical appeal process.

(FAC at 85.)

Five days after his second-level appeal was denied, on July 15, 2009, plaintiff sought a Director's Level review, stating in part: "I have suffered numerous diseases (i.e., Multi Level Disc Disease; Diffused Joint Disease; Gingivitis (from lack of sun & exercise)."  (FAC at 82.)

Seven months later, on February 28, 2010, a Director's Level decision was issued on plaintiff's appeal No. HDSP-31-09-11658.  In it, the reviewer asserted that "[t]he issues regarding institution lock downs is [sic] a custody issue and . . . not appropriate for the health care appeals process."  The reviewer concluded that "no compelling evidence . . . warrants intervention  at the Director's Level of review as your issues have been addressed appropriately per the CDCR policy by medical staff at HDSP."  (FAC at 78-80.)

1        Turning from the FAC to plaintiff's opposition to summary judgment, the court finds that

2  plaintiff presents little or no additional evidence pertinent to his claims against defendant Davey

3  at HDSP.  Most of the documents he attaches concern his treatment at SVSP, where he was

4  subject to relatively short periods of lockdown resulting in no demonstrated medical harm, as

5  discussed above.  Medical records from the relevant period at HDSP do not address plaintiff's

6  lack of outdoor exercise or any resulting physical problems.  (ECF No. 91 at 159-174, 176-178.)

7  In a submitted declaration, another HDSP inmate, Ricky Keel, states that he has been "denied

8  outdoor exercise on a continuous basis" and as a result suffered emotional distress, hepatitis C,

9  carpal tunnel syndrome, and lung disease ("COPD").  (ECF No. 91 at 240.)  However, this adds

10  little to the existing record.

11        Has plaintiff created a genuine dispute of fact as to whether the lockdowns at HDSP were

12  "reasonable"?  As in Norwood, plaintiff submitted "repeated complaints to prison officials

13  regarding the duration of the lockdowns and deprivation of outdoor exercise."  2013 WL

14  1127604, *21.  Over the course of several months, he stated that, as a result of long periods

15  confined to his cell, he was suffering pain in his legs, arms, and stomach, and that this treatment

16  was "inhumane" and required "intervention."  Moreover, defendants do not contend that the

17  lockdowns had anything to do with plaintiff's behavior or any threat he personally posed to prison

18  safety.  See Thomas, 611 F.3d at 1153 (long-term lockdown unreasonable where record showed

19  that prison officials "did not consider [plaintiff] intrinsically dangerous").  Finally, as in

20  Norwood,

21          [d]efendants have presented substantial evidence that the lockdown
           periods without access to outdoor exercise were necessary to

22          protect both the safety of the inmates and staff.  While Defendants'
           actions may have been reasonable to address this goal, Defendants

23          do not show any act aimed to provide inmates with any type of out-
           of-cell exercise during these lengthy and repeated lockdowns.

24

25  2013 WL 1127604, *22, citing Spain v. Procunier, 600 F.2d 189, 200 (9th Cir. 1979) (even where

26  security concerns might justify a limitation on permitting a prisoner "to mingle with the general

27  population," such concerns "do not explain why other exercise arrangements were not made.").

28  /////

1  Based on the foregoing, the undersigned concludes that plaintiff has raised a genuine

2  dispute of fact as to whether defendant Davey violated plaintiff's Eighth Amendment right to be

3  free of cruel and unusual punishment.

4  3. Qualified Immunity

5  Davey contends that he is nonetheless entitled to summary judgment under the doctrine of

6  qualified immunity.  Government officials enjoy qualified immunity from civil damages unless

7  their conduct violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267

8  F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a

9  court is presented with a qualified immunity defense, the central questions for the court are: (1)

10  whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

11  defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

12  was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001).

13  In Noble v. Adams, 646 F.3d 1138 (9th Cir. 2011), the Ninth Circuit determined that

14  prison officials were entitled to qualified immunity with respect to a seven-month lockdown

15  following a prison riot, as

16
17  . . . it was not clearly established in 2002 — *nor is it established*
   *yet* — precisely how, according to  the Constitution, or when a
   prison facility housing problem inmates must return to normal
18  operations, including outside exercise, during and after a state of
   emergency called in response to a major riot, here one in which
19  inmates attempted to murder staff.

20  Id. at 1143 (emphasis added); see also Mitchell v. Cate, 2014 WL 546338, *17, n. 8 (E.D. Cal.

21  Feb. 11, 2014) (collecting cases about the lack of consensus on this issue).  Similarly, district

22  courts have found that "[i]t is not clearly established exactly how or when prison officials must

23  lift a lockdown or modified program implemented in response to threats to the safety and security

24  of the institution arising from riots or information that inmates plan to assault staff."  Norwood,

25  2013 WL 1127604, * 23.  In Norwood, the court continued:

26  In light of the undisputed evidence regarding the reasons for the
   lockdowns/modified programs, the investigatory steps undertaken
27  in  responding  to  events,  and  that  prison  officials  lifted
   lockdowns/modified programs in stages depending on the results of
28  the investigations, it would not have been clear to a reasonable

1
2
3

> officer that restricting an inmate's outdoor exercise in conjunction with the lockdowns/modified programs during investigations at issue here was unlawful.   Therefore Defendants are entitled to qualified immunity for the lockdowns [at issue].

4    Id.  Here, on a similar record, and in the absence of established law clarifying at what point, and

5    under what circumstances, a security-based lockdown becomes unconstitutional, the undersigned

6    concludes that defendant Davey is entitled to qualified immunity.

7    4.  Motion for Stay

8            After briefing on defendants' summary judgment motion was complete, plaintiff filed a

9    motion seeking to stay this action and conduct additional discovery in order to "prove that the

10   Defendants[] both caused in cell murders, and untold number of serious in-cell assaults during

11   these alleged security lockdowns."  (ECF No. 93 at 4.)  Plaintiff's motion will be denied.  See

12   Family Home and Finance Center, Inc. v. Federal Home Loan Mortgage Corp., 525 F.3d 822, 827

13   (9th Cir. 2008) (Rule 56(d) requires that the requesting party show (1) it has set forth in affidavit

14   form the specific facts it hopes to elicit from further discovery, (2) the facts sought exist, and (3)

15   the sought-after facts are essential to oppose summary judgment.).

16          Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for stay (ECF No. 93) is

17   denied.

18          IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF

19   No. 77) be granted.

20          These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  The parties are

25   /////

26   /////

27   /////

28   /////

1    advised that failure to file objections within the specified time may waive the right to appeal the

2    District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3    Dated:  June 15, 2014

4                                                    _____
                                                    CAROLYN K. DELANEY
5                                                    UNITED STATES MAGISTRATE JUDGE

6

7    2 / cran0663.sj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28